Good morning, Your Honors. Frank Sproul is appearing for petitioner. Please, the Court. This matter is a motion to reopen of an asylum case that argued the undeniable fact, to quote Shakespeare, that the Middle East is descended into chaos and dark night. I don't think subsequent events have changed that. It is our opinion that the BIA essentially, you know, went over backwards to deny the motion and gave very short shrift to what I would concede is the country conditions. The Board essentially conceded, weakly conceded, that the government is obviously somewhat ineffectual after the Arab Spring, that the tribes are sort of almost sovereign. But that is the whole point of the case, that they were somewhat ineffectual prior to the Arab Spring, that they, that the civil authorities will pursue criminal matters, but if it is regarding the tribes, they simply let them have their own way. Isn't your main change circumstance here, though, the mother's murder and not the country's circumstances? Well, the two are sort of dovetailing to one another. You know, the argument is that because of the atomization of the society and then, you know, we don't really have the motives of the murder of the mother, but we also don't think it's just a random senseless act. And that's one of the reasons we think a remand would have been appropriate. It could have been fleshed out. I'd like to ask you a question. A lot of your arguments are based around the murder of the death of the mother. It's claimed by your client that the police report shows that. But looking at the, at the police report itself in the translation, it says the corpse of Furnoon, F-N-O-O-N, that's a man's name. I understand. A woman's name is F-A-N, Furnoon Quigford, on the floor of the room with a bullet in the head and right hand that resulted in his death. So the police report indicates that a man died that perhaps had a similar name. Now, how, how do we, how do we show, how do you show there's evidence of the mother's death that they had to, had to accept? Sure. I mean, it's obviously a problem. You know, the letter from the uncle references the mother. I can only assume there's a translation. The letter of what? The, the declaration from the uncle references the death of the mother. I, I agree. I mean, there's comical misspellings in there, too. Not only comical, it's critical. Right. It's, you have, your whole evidence is built around the mother's death. The I.J. maybe was right that the mother is still living, and it's a valid argument. It really interferes entirely with the, with your argument. So why do you have a record? Why do you have a record against that argument? The declaration and the murder of the mother occurred in the context of the motion to reopen, so the I.J. never addressed that. That was not, the letter, the, the letter and the death of the mother was subsequent to the I.J. No, no, I meant, I meant his argument that the mother is still living, and that's evidence that the son would be safe. Right. But again, that was when the matter was before the I.J., mom was alive. Mom presumably, and I understand that. Maybe. Right. There's no real, solid evidence that the mom's dead. I admit I'm a little hamstrung. I had nothing to do with the matter. I'd like to follow up on my colleague's question, because the, as you know, in order for your client to be successful on this motion to reopen, he has to show that the In this case, the attackers weren't identified. The letter from the uncle didn't say why she was killed. Indeed, as my colleague points out, if she was killed, it only was stated only it was determined by the investigation that the entire family were targeted, including you. You know the reasons. Didn't say why. Right. Who knows what the reasons were? Because she wasn't dead? I don't know. And there was no copy of the investigation report provided. So the burden of proof is on your client, is it not? Absolutely, Your Honor. And so what do you rely upon then to show that the mother's death was related to the asylum claim in light of what I just said and what my colleague had just asked? I don't disagree that it's a tough hurdle. That, I mean, there has to be a little bit of a circumstantial leap that the chaos in I grant you does not, you know, there's no... I was going to say, with respect, I think every case that I've heard in the last year and a half that involves someone from the Middle East claims the Arab Spring has caused whatever it is. And I don't minimize for a moment the tragic things that have happened from time to time. But as you well know, as a naval lawyer, you have to tie what actually happens involving these people to show that you meet the burden of proof. And I, like my colleague Judge Wallace, I struggle. I do not see and hope you can point out to me in the record where your client has shown that the mother, number one, was killed and number two, that it was related to his claim for asylum. It's a problem. I mean, the record is woefully thin. I mean, essentially, we have, you know, a four-paragraph declaration from the uncle. We have a two-sentence paragraph from the respondent. And then the police report. Again... I just want to be sure I understand. So basically, you're conceding that the mother issue is a problem. That's not going to help you. So if the mother's death, whether or not it occurred, is not going to help you, what do you rely upon to move forward in your case? Number one, I think circumstantially, we can argue, and there is case law that would say a murder unless, it's not presumed that it's just a senseless act when it's in the context of this case. And then the other point would be, you know, the original claim was that there was a tribal, you know, dispute. And then the country conditions demonstrate that essentially the tribes were on the country and that would, you know, sort of require a remand to bring it together. With respect, counsel, how does that tie to your client? That's what I struggle with. I don't question that there are some problems. I don't question it at all. But your client has the burden of proof to show that something has changed related to him. All we've got so far, I mean, what the uncle said is nothing. It doesn't tell you anything. Because as my colleagues pointed out, the alleged death is of a male, not of the mother. But the BIA assumed in the decision we're reviewing that the mother was murdered, right? Right. I mean, again, I think they're just assuming it was a typo that, you know. So I understand it's a problem. I guess the other point I would make is that take the mother out of the situation. I mean, one of the arguments of the original decision was that they didn't think there was a, you know, number one, he could relocate safely. And I think, you know, the Arab Spring itself would undercut that. That fact itself. It's not reasonable or safe for him to be anywhere in Yemen. So one of the linchpins of the original decision, the Arab Spring itself undercuts. That would be grounds for the motion re-opt, in and of itself, completely apart from anything specific to him. And then, two — Do I understand your argument is that every case that comes up involving the country with countries involved in Arab Spring automatically are going to be able to get jurisdiction to renew things that happened nine years ago? Well, no. I mean, if you were — There has to be a connection. And it's that connection that I'm having concerns with. Well, sure. But, I mean, in this specific context of this case, one of the arguments was relocation was possible, and that undercut the original claim. The Arab Spring and the chaos in Yemen undercuts that. Now, sure, that would cut a wide swath, but that is the facts on the ground. And doesn't the mother's murder, which the BIA assumed happened, support or at least undermine the original decision that said that the fact that the mother was alive showed that he wasn't really in danger as his father's relative? Exactly. I mean, we — you know, again, the board didn't address this. They assumed a priori that it was, in effect, a murder, and it was mom. So, I mean, that, I think, coupled with the chaos in Yemen, is enough to remand. I mean, obviously, you know, the case law doesn't require a case that would be granted. Right? It's a — you know, it's enough to have a plenary hearing to flesh out the issues. With respect, doesn't — wouldn't the — let's assume for a moment that the mother, in fact, was murdered. Doesn't your client still bear the burden, the proof to show that her murder had something to do with the issue that he raised in the first place? I mean, sadly, people are murdered in this city and in Los Angeles and every other city every single day of the year, pretty much, at least the big cities. And it's tragic. It's really, really sad. But if somebody is murdered in East Los Angeles, that doesn't help your client, does it? That's right. You've got to show how the murder of the mother bore directly on the asylum claim. And indeed, this — I assume you're relying on the reasonable likelihood issue. You don't even argue that in your brief. You're making it now. But what are we to make of that? If you have not raised it in your brief, are we to discount that, to waive it? What do we do with it? Well, I think the brief argued that the murder of the mother is obviously a new fact. And we tried to extrapolate that it wasn't just a senseless act. There's no evidence that it was like a, you know, a mugging. And when you, you know, extrapolate that to the facts on the ground, it was enough to warrant reopening. And I think my time's — Any other questions of my colleagues? Very good. Thank you for your argument. We'll hear from the governor. I know sometimes this is frustrating, but it's a problem with being before a hot court. We read everything before we come on the bench. You didn't lose anything by not giving it. You were answering the questions that most bother us. So I hope you aren't disappointed that we didn't let you give that speech you gave your wife last night. May it please the Court. My name is Ted Hurd, speaking on behalf of the Respondent, the Attorney General of the United States. Your Honors, in this case, we contend that the Board acted well within its discretion in denying this untimely motion to reopen, a motion that was filed approximately eight years after the original incident that gave rise to the asylum claim. And as the Court recalls, that original asylum claim was reviewed carefully by the immigration judge, reviewed carefully by the Board, and this Court, in an unpublished decision, found that Mr. Eltafey did not suffer past persecution and did not show a well-founded fear on the theory that he could relocate. Now, pausing on relocation, just for a moment, Mr. Sprowls has said, well, there's nothing about relocation in the current proceeding. Well, that is true. The Board did not reach the issue of relocation, and indeed, it was not argued in this case. So I don't think we need to touch back on relocation. I think the fundamental flaw in the Petitioner's argument here today, and I think Mr. Sprowls sort of identified one of the dilemmas here, which is that he's trying to combine two separate phenomena, the phenomenon of the broader Arab Spring that engulfed the Middle East, and then connect it back to a very unexplained incident involving the purported death of his mother. I want to come to touch quickly on the Arab Spring and then turn to the mother's death issue. It seems to me that the Arab Spring problem, as illustrated in our brief, is really not something that was shown to be material to reopening of this specific asylum claim. Picking up on Judge Wallace's question, perhaps Judge Smith's, too, this is not a situation, as I think the Board viewed it, where there was a connection, a linkage between broader phenomenon in the country of Yemen and the particular circumstance pleaded, argued, asserted in the asylum claim, which was a very specific dispute between two men of rival tribes and a claim by the Petitioner of retribution. So the retribution was not acted upon. The gravamen of the earlier decision was one threat in the street by the son of the deceived, 10 days after the accident. Kennedy, is there any evidence in the record that would show or tend to show that the death of the mother, if indeed it occurred, came about as a result of the intertribal dispute? There is not, Your Honor. And I would say that one of the indicia of the absence of evidence goes to the point, the fundamental, one of the fundamental points of the Petitioner's argument, which is that the police in Yemen, the law enforcement officers in Yemen, stand down and do not get involved in intertribal disputes. And yet, if we credit the police report at all, the police got a report that the Al-Taifi house has been assaulted, gunfire. They immediately, according to the report, they immediately went to the scene, but the bottom line was the perpetrators were not identified. I think a fundamental point linking us back to the ---- Kennedy, did they investigate the mother's death? Did the police allegedly investigate the mother's death or not? I would say that they did. All we know from the police report is that they went to the house, they made a thorough examination of the house, and the witnesses basically said, we can't identify the perpetrators because they were masked or they were shrouded. They investigated the decedent's death. No, no, this is the ---- Well, I'm judging this question, I think, was about the mother's death in 2011. Right. Clearly, the police investigate the other fundamental point, which is very much asserted by the Board, is that the premise that the police stand down and do not get involved in intertribal rivalries is refuted by the original asylum claim where the police arrested and would have prosecuted the father of the Petitioner, but for the fact that he died of diabetes in jail. And I guess the other point I was going to make, Your Honor ---- But isn't there a tension between the original decision that said that the fact that his mother was still safe and living in Yemen undermined the idea that his family was at risk, and the decision now that says the fact that his mother has now been murdered doesn't seem to matter? Well, Your Honor, I'm not ---- I wouldn't say that ---- I wouldn't want to characterize it that the death does not matter, but I think that the background of this case is a situation where, as far as the facts go, in August, September, October of 2003, we have one threat on the street by the son of the decedent basically telling al-Taithi, I am going to get you, and the you was outlined in the record several times. There was no evidence in the record up to the time of the removal hearing that any member of the so-called al-Siddiq tribe was going to take revenge on family members of the al-Taithi tribe. There's no threat ---- Mr. al-Taithi reported no threat against any family member at any time before he left Yemen. And I think the other conspicuous point is that there is no evidence in the record that I've seen to the effect that any member of the al-Siddiq tribe either had a vendetta going forward against the al-Taithi tribe, or more importantly to, I think, Your Honor's question, there were no threats uttered, to our knowledge, against the family. And a final point, I think, which is also at least ---- Kagan. Yes. Kagan. We have to affirm on the basis that the BIA gave in its decision, right? It sounds to me like you're adding arguments that the BIA didn't actually make itself. No, I don't. Well, I don't believe I'm making arguments to that effect, because basically the fundamental ---- the two fundamental points of the Board decision are basically that you have not shown a connection between the original ---- between the threat and the original asylum claim, the more significantly paragraph of the Board's decision, and what allegedly happened to the mother 8 years ago. And I ---- But the Board didn't say the 8-year gap shows that it's impossible. The Board didn't say there isn't evidence of other threats. I mean, they didn't make these elaborations that say that in Yemen, the fact of this much time passing would mean that it couldn't have been the same threat or anything like that, did they? Well, the Board did not ---- the Board did not say this is 8 years later, but I think that's ---- I mean, I think that's just an objective fact on the ground. And I think that it goes back to the point that the Board did say, which is you've not shown ---- the Board did say you've not shown any antagonism, vendetta, between these two tribes, and none of your country conditions' evidence shows that. And indeed, there's no evidence from the police report about the perpetrators. I would guess I would say, and I hope I'm not going too far with this point, Judge Freeland, is I think the other salient ---- the other sort of salient point here in terms of this police report and the absence of follow-up, because the Board said there's a police report that the uncle supposedly submitted, but there's no follow-up report by the police. So if there's an opening report by the police, the incident report, the Board can legitimately ask, why did Mr. Altafi's uncle not go back and get a secondary report that's a closeout report? Because ---- Kennedy, I'm sorry, Your Honor, Judge. Kennedy, at least as I understand it, what the Board said here was, as my colleague has indicated, they seem to assume that the mother was dead, had been murdered. But what they also pointed out was there was simply no evidence tying the mother's death to anything related to his original asylum claim. There was no ---- the attackers weren't identified. It could have been robbers off the street. It could have been whatever. The uncle's letter didn't say why she was killed. He said that you know the reasons, but that's not going to make it legally, and there's no copy of an investigation report. So as I understand it, that's really what the BIA was saying is, you know, you have the burden of proof. You have done nothing to tie the mother's death to your asylum claim. Ergo, you have not reached the requirements, put on proof to reach the requirements to reopen the case. Is that a fair statement? I think that's a fair statement. And the Board uses the word material or materially four times in its decision, which is a direct linkage back to this Court's Truffigee decision, where the Court in that case emphasized involving another Middle Eastern refugee, asylum applicant, that there has to be what I'll use the term linkage between the claimed fear that arose in the original asylum proceeding, and now the new incident gives rise to the motion. I don't know if that's a fair statement. Did the Board apply the wrong legal standard here, though? In footnote 4, when they say or, I'm sorry, in footnote 1 on AR-4, when the Board says that he did not establish his eligibility for asylum, was the Board expecting more than should be required in reopening, where the issue would be whether you just have made a prima facie showing that you might be able to establish an asylum claim and, therefore, are entitled to a hearing to further develop some of these facts? Katyala, I think that the Board is properly citing Truffigee in that intermediate paragraph, because it's using, it's picking up the material evidence point from Truffigee, and it's comparing the original evidence. Right, right. I'm looking at the next sentence, where it says he has not established that he now has a well-founded fear of persecution. Shouldn't it just be whether he's established a prima facie showing, which would be a reasonable likelihood, instead of actually establishing his claim at this stage of seeking reopening? Well, I think my colleague is referring to footnote 1. Well, I think that there are two points here. The text, which is the sentence you just quoted before the Truffigee citation, I think that's the Board basically saying, this is now at least a 10 percent chance in that sentence. Oh, sorry. I said AR. No, it is AR-4. So it's footnote 1. It's the second sentence of footnote 1. I'm not sure. It seems like you might be looking at something else. However, the Respondent has not established that he now has a well-founded fear. Oh, I'm sorry. That is a — I think that is a different point, which goes to a lack of nexus to any sort of family relationship. That's a whole different issue, Your Honor, from whether he's shown evidence material to his case. I think that goes back to that he has to show also that the family is at issue. So I think that's a different point. But isn't that relevant? I mean, isn't the fact that the mother was murdered at least relevant to the question of whether his family is at risk? And hasn't the Board applied the wrong standard to that question at this stage? I don't disagree that the death of the mother assumed to be a murder at this point is relevant, but we still have the problem which the Board identified with the police report and the uncle's statement, for that matter, that neither statement link the under the Petitioner's theory in the motion to reopen family as a social group. So I don't think the Board is making an error in it, making an error here. I think it's using the present tense to say, today's — based on today's evidence as we look at it, you've not established a nexus. It's not prejudging the case. Kennedy, did the Petitioner raise that issue in his brief? Excuse me, Your Honor. Did the Petitioner raise the issue of the standard in his brief? I don't believe, other than acknowledging its abuse of discretion that he got, I'd have to go back and look at his brief for that. I don't think it was — The government's not necessarily contending that that issue is waived. Is that correct? I would not say that he's waived issue in talking about the standard of review, Your Honor. Do either of my colleagues have additional questions? Well, thank you, Your Honor. We ask that the Court affirm and deny the Petition for review. Thank you. Thank both counsel for your argument. The case just argued is submitted.
judges: Wallace, Smith, Friedland